All right, our next case today is Barrett v. Williams. All right, we'll hear first from appellant. Is it Mr. Bach? Yes, Your Honor. Good morning. May it please the Court, I'm Jason Bach on behalf of the a procedural due process case as examined by this Court under McKinney v. Pate received some sort of pre-deprivation process. Ms. Barrett did not receive any. Ms. Barrett was never provided. Well, sorry, let me just make sure that we're on the same page here. Sure. It seems like she did receive notice in the form of being told by Dr. Williams that if you know what the problems were with her conduct in the lab and towards other students and that if she didn't improve those things that she would be let go. Why wouldn't that be considered notice? Well, because it wasn't until these other complaints came in when Ms. Barrett was out of the country that Dr. Williams said, okay, now that I have these other complaints about her conduct, I'm going to no longer be her major professor. She made that decision. Well, but didn't she also have an opportunity to meet with Dr. Williams and she declined to come into the meeting? Well, she was never told what that meeting was about. But it's still an opportunity to meet with her and she, I mean, she obviously knew what it was about and that's why she didn't want to go in. I mean, why doesn't that count as an opportunity to be heard, especially after she had been previously told by Dr. Williams that if she continued to engage in the same kind of conduct that Dr. Williams would no longer be her advisor? Well, and it wasn't that she refused to meet with her. She simply asked to know what the meeting was about. And, you know, under several definitions of notice, notice isn't just saying, hey, be here at this time. It's, you know, be here at this time to address these issues. What would it have possibly been about besides the issues that she was facing? Well, in fact, it was about issues that she didn't even know existed because these were out of the country. So she wasn't aware of what these new issues or if there even were new issues. So she did not know what the allegations were that were made when she was out of the  Right, but my understanding is that Williams wanted to talk to her about that. But Williams, her testimony was that she had already made her decision at that point before even asking for Ms. Barrett to come in and meet with her and Dr. Echols. She had already made her decision at that point and that was her testimony. So whether or not that's considered to be noticed or not is irrelevant because she had already made her decision at that point. So what is the property, what would you say is the property interest that your client is asserting? Her ability to obtain her Ph.D. degree. And she was an actively enrolled student. You could argue in good standing. She wasn't on any type of probation regardless of this back and forth with Dr. Williams that they've had and the conversations they've had. So when was she kicked out of the Ph.D. program? Well, she was, that's a common topic that was discussed in depositions.  And so what they would say is that she was never kicked out of the Ph.D. program. Right. That this was just going to be an ongoing, into a perpetuity that she could stay enrolled in the Ph.D. program. However, as of the spring of 2023, she just could no longer enroll, I'm sorry, into the summer of 2023, she could no longer enroll into any new courses in the Ph.D. program. Right, because what she needed to do was finish her, I can't remember, dissertation or research project or whatever, right? Yes. And no one told her that she couldn't do that, right? Yes. She was not allowed to continue in the Ph.D. program and receive any credit or continue on any projects at that time. No, she was told that she needed to have a faculty advisor. A major professor. Yes. Yes, so. Right, so no one said you can't do this. They said you can do this with a major professor. All right, you're right. Backing up in time, there was a point there when Dr. Williams said I'm no longer going to work with you, but Dr. Echols said, you know, obtain a new major professor by this date in February, and you can then go ahead and continue. The problem is that Dr. Williams and Dr. Echols had already poisoned the well. They had told everyone in this department about the problems that they felt they were having with Barrett, and the one professor that she found who was interested in working with her went and talked to Dr. Williams, and then suddenly after he talked to Dr. Williams, he was no longer interested in doing that. So you can't say, hey, it's no big deal. Go find a new major professor, and you can go and continue on, and then do everything in your power to make sure that that doesn't happen. I'm definitely not, I would not assert that it's no big deal. I don't know if anyone there asserted that, but is there any evidence that they took affirmative steps to tell the rest of the faculty that they could not work with her? Yes, there was a testimony that they had spoken with a number of people in that department, including the people that were on her supervisory committee, which were also people in that department, and then also the one professor who, because she… She said spoken with, but I'm being very specific. Is there evidence that they said do not work with Ms. Barrett? They did not say do not work with her. Or you cannot work with Ms. Barrett. They did not say that. What they said was they indicated to these professors that they may not want to work with her and expressed what problems that they felt that they had with Ms. Barrett. But that's different, right? I mean, are they, is there, was there some sort of gag order that they were supposed to abide by and not sharing their experiences? No, but at the same time, they never had a hearing to address any of these issues that they were accusing Ms. Barrett of. They never gave her an opportunity to respond to these latest allegations that were made when she was out of the country. So, you're taking away every opportunity that she has to complete her Ph.D. program without giving her any opportunity to respond to anything. So… On the front end, but isn't that the whole point of the Valencia says, but you have the back end opportunity as well, and your client didn't do that, right? Right. Okay. And I think we go in pretty detail in the briefs as to why we disagree with that decision in Valencia, and we don't think that's the controlling decision here. We think that McKinney… And can you lift up those top arguments for why you believe Valencia? You're saying wrongly decided, some would say doesn't apply. Right. And so, under McKinney, that's an en banc decision that is controlling here, and we agree with that decision. We don't have any problem with that case, but we think it's been applied in an unfair way and not in a way that is consistent with that ruling because in McKinney, it was very limited. It was limited to these types of situations where most of these cases that had come after McKinney involved some sort of hearing, and there's been some sort of allegation that there was a bias in that hearing. Well, under McKinney, they said, well, there's no way to anticipate that, you know, so therefore that's not a due process violation at that point, and so therefore you have to go and exhaust your post-deprivation revenues as well. Right, but is a formal hearing and quasi-judicial process required for every deprivation? Well, I don't know about every deprivation, but certainly in this situation where you have a student that's been accused of misconduct, and we believe that the case law is pretty clear on that. I know the appellees are going to argue that this is an academic issue, not a disciplinary issue, but we strongly disagree with that. But the other issue, getting back to your question, Your Honor, about the state remedy, we don't believe that that was even an option for her because when you look at the Florida Rules of Appellate Procedure and look at the circumstances where you can apply for a res certiorari, there are certain circumstances that have to take place. One, there is usually some sort of hearing and some sort of a written decision or final order of some kind. She wasn't given anything. She was just left in limbo the entire time, so she had nothing to appeal from or go to. But doesn't she argue that there are procedures that the college has to use in order to release her from the program and that they didn't follow those procedures? Well, but the problem is she hadn't been released from the program. I understand, but isn't that one of the arguments that she makes? In theory, yes, but I don't think that would, in my opinion, that doesn't fall within the rules of She does say she has a right to those procedures, doesn't she? To the procedures in state court? The procedures that the school is supposed to use before dismissing her from the program. She does, but the problem is that they claim that their procedure is no procedure in this situation. However, she would argue that she should have at least had a right to appear before her supervisory committee and make a case there, have a hearing in front of them. And then there was also the SARC, the Student Academic Relations Committee, that she asked Dr. Buchanan if she could appear before them in order to make her case, and all of those were denied. She sent Williams a 31-page letter as a request for reconsideration, right? After she had made her decision, yes. Right. And Williams reviewed the letter, said she gave it ample consideration, kept her original decision, and referred Barrett to ECHL, right? Yes. And then after several emails, ECHL offered to help, but Barrett never responded, right? This was after numerous emails where Ms. Barrett had been told that there was no appeal, there are no appeals, and then once Ms. Barrett reengaged with Dr. ECHL again, she was told the exact same thing. You know, there are no appeals, there's nothing you can do, there is no path forward here. Those were the words that were used, there's no path forward here. What is the program under any— does it have the ability to force any of these professors to be a major professor for a student that they don't wish to work with? I don't know. They claim that they don't, but what we do know— I'd be surprised if they did. Well, what we do know is they did everything in their power to make sure that that didn't happen. By sharing information and not giving her any process or even hearing her out before making that decision. Well, but what you're saying— I find it a little confusing because you're saying Williams told her that Williams would not work with her. And so once that decision is made, anything is post-deprivation. So are post-deprivation procedures available or not? Right? All she was wanting, it seems to me, is a post-deprivation procedure. Because it's Williams' call in the first instance. And then everything she was seeking was to deal with that problem, to try to find a new major professor. We would argue that she was entitled to a pre-deprivation hearing before Dr. Williams made her decision. And after Dr. Williams made her decision, she was entitled to have a hearing before someone else within the school. That's our position. But is there even an argument that the school had the ability to force Williams to be a major professor for a student that Williams did not want to work with? I mean, she was their employee. And they could have made some sort of effort to transition Ms. Barrett into another mentorship with another major professor. I mean, Ms. Barrett is an adult in graduate school. I don't understand. I mean, if my child in sixth grade has a problem, I don't make sure that demand that the school take care of it. Why wouldn't an adult in graduate school be expected to find a professor to work with them? And she did reach out to a number, if not all, of the professors in that department that she could work with. And she only received one professor who was interested, and that's the one who spoke with Dr. Williams. So that professor reached out to Dr. Williams, right? Yes. Not Dr. Williams affirmatively reaching out to everyone and saying, do not be involved with this student, right? No. We are aware that she spoke with the members of the supervising committee about Ms. Barrett. And keep in mind that this department is not large. I mean, it's probably less than a dozen instructors as far as I understand. So, I mean, to reach out to her supervising committee, told them not to have any contact with her initially, and expressed her concerns that she had. I mean, she has poisoned the well at this point. Ms. Barrett is not going to find someone else who is willing to step forward after Dr. Williams has gone and spoken with these people, whether on her own volition or them coming to her and sharing this information. So is her assertion that when that professor came to Dr. – the other professor came to Dr. Williams, that Dr. Williams was barred somehow from sharing anything about his or her experience? Well, I think she at least should have shared that she didn't bother to get Ms. Barrett's side of the story before she made her decision. What about when she asked to meet with her and Barrett refused? The day when Ms. Barrett came back from her trip overseas, Dr. Williams asked to have a meeting. Didn't say what that meeting was about. Ms. Barrett said, before I meet with you, can you tell me what that is about? She didn't receive a response to that. I think we've got it. Thank you. All right. Thank you, Mr. Bach. And you've reserved five minutes for rebuttal. We took Mr. Bach over by six minutes. So, Mr. Carey, we're going to give you an extra six minutes, but you are under no obligation to use all that time. May it please the Court. Good morning, Your Honors. My name is Brian Carey. I'm here on behalf of the appellees, Dr. Diana Williams, Dr. Lisa Echol, and Dr. Jennifer Buchanan. And I'm a little maybe confused with what counsel is representing or the major focus of his argument before the panel today in terms of what the constitutional deprivation, the property interest that he is claiming occurred, because there was a lot of focus on the issue with Dr. Williams and her disassociation from the major professional relationship that she had with Ms. Barrett. Well, maybe if you don't mind to start, at least for me, can you state as clearly as possible what the pre-deprivation process is for the university? Because Ms. Barrett is saying that there were certain steps that were supposed to be followed, and I understand generally the defendant's position to be that there aren't any set steps, but to the extent her argument is that she deserved reconsideration, she got that. So what exactly does the university provide in terms of pre-deprivation process? Okay. And Judge Abudu, I hope I answered this question. To go back to what Ms. Barrett has brought before the court is she has claimed that her constitutionally protected interest was to remain enrolled in the university. She did not raise in her brief a constitutionally protected interest that Dr. Williams remained her major professor, that she remained in the lab. And, in fact, Ms. Barrett admits in her briefing and in the record that there was no obligation, and she understood there was no obligation. Okay, I'm sorry. Maybe you're getting there. And I think that there is a blurring or conflation here about procedural due process and the substantive due process. I'm just talking about the procedural due process. What is that process? Your Honor, Appelli's position is if they're alleging that the continued enrollment in the program is a property interest, that was a purely academic procedure. And under an academic procedure, the case law states that the only process that is required, there's no formal hearing process, it be careful and deliberate. So what we have in this situation is in October of 2022, Ms. Barrett was advised that Dr. Williams was no longer going to be her major professor. And within days, Dr. Echol advised Ms. Barrett, you are still enrolled in this program. You're continuing in this program, which is the constitutional protected interest that she's claiming in this case. Dr. Echol was clear to provide Ms. Barrett what the academic requirements were to remain enrolled after the spring semester, and that was to attain a major professor. So in that sense, what they've alleged in their brief, that is the process that they're due, a careful and deliberate process to remain enrolled because this was a purely academic decision at that point. And under the school's policy for this program, just to be clear, there is no other avenue to obtain the PhD without a major professor. That's correct. So when Ms. Barrett entered into the program, it was with the understanding that no professor, no degree. Yes. Okay. Yes. And in fact, Your Honor's questioned counsel about the relationship, and we can see from the record that is a mutually agreeable relationship. That's what the bulletins say, that the major professor has to agree with the student, form that relationship, and keep that relationship. And a prime example of that, which is in the record, is when Ms. Barrett started at the PhD program, she had a different major professor. She had a disagreement with that major professor and things in his lab, so she disassociated herself from that major professor, and she sought a different major professor. Dr. Williams was willing to pick her up. But the argument, as I understand it, then is not so much her opposition to the policy, but that the university poisoned the well to make it impossible for her to satisfy that criterion. If that's what Ms. Barrett is alleging, that's not the issue before the court, nor was it the issue that the district court ruled in summary judgment. Ms. Barrett brought one-count complaint against my clients, and it was a one-count complaint for violation of procedural due process. So that is the issue before the court, and that's what basically the district court ruled in granting summary judgment for the Israelis. Thank you, and that's why I wanted to clarify, then, what is the process that she was due? And you're starting with the point that technically she was due no process because she had no property interest at stake. She had no property interest in the Williams issue. There's no constitutionally protected property interest in the Williams issue, and she recognizes that. Ms. Barrett does. Now, in terms of... It's almost like there's two acts in this case. There's what occurred with Dr. Williams in a lab, and then there's the five-months notice that you needed to get a major professor, up to the point that Ms. Barrett decided that she was going to take a master's degree as opposed to trying to get a major professor further and proceed in the program. So in terms of your question about what the process is and whether there's a constitutionally protected interest in... The Supreme Court has never ruled, as far as I know, the Eleventh Circuit has never ruled or recognized a constitutionally protected interest in remaining enrolled in a university when the court or the issue is being dealt with as an academic dismissal or separation. I mean, the facts in this case are undisputed that Ms. Barrett was not dismissed from the university. Ms. Barrett was advised her paths could be find a major professor or go ahead and take a master's degree, which she voluntarily chose to do. Well, it doesn't sound that voluntary. If she's here suing you today, it wasn't her preference. It wasn't her preference, absolutely, but she could have continued to... It wasn't the university, neither did any of the appellees ever say, you're out of this program, we're kicking you out. I mean, that's true, but it almost seems constructive, right? Because there's no way she could continue in the program if she didn't have a major professor, right? She could not continue without a major professor. And we all know she couldn't get a major professor. There's really no question about that, right? I think there is a question, and I think the wording is very careful in the record evidence and in the briefing is that she asked major professors that were advertising, hey, I'm looking for students to work in my lab. There's no statement from Ms. Barrett in the record that says I contacted everybody in the program. She contacted the people that were advertising. So I believe there's careful language there. In terms of the protected property interest that Ms. Barrett is claiming, I think an issue that the court may want to consider in this case is when was the deprivation? When did that occur? Well, even to go back for us to talk about what the property interest was at issue, did the district court ever do that? Because I didn't really see a lot of any analysis on that point. The district court did not render analysis on that point. The district court start with the undisputed fact in this case is that Ms. Barrett did not pursue, did not avail herself of any state court remedial measures that she could have, and she admitted that. So I believe it appears that the district court stopped the analysis with that. If we're dealing with a situation where it's undisputed, she didn't pursue and avail herself of any remedies, then citing the cases that it did to Owe and citing McKinney, that a due process claim does not exist at that point. It's not clear to me that there were state court remedial measures available in this case. I mean, to me it's somewhat of an over-reading of Valencia to say that everyone needs to seek start in Florida courts because in that case it was available. Here, I'm not sure what she would have said to a Florida court in filing this petition. Well, what she could have said, and we see it in the record and we see it in the briefing, is Ms. Barrett is claiming that all these procedures were denied her. So a prime example of that would be if she's saying that she was entitled to go before SARC and have her issue heard, then she could have filed a writ of mandamus and she could have asked the court to compel, for example, Dr. Buchanan to perform a ministerial duty of sending Ms. Barrett's issue to SARC. She didn't do that. She could have done that with any of the other steps that she says she was entitled to. And it's not the end result here. What we're looking at in a federal due process claim is what process was available. So even if in the end a court might have denied that. I'm still, I mean, I'm still less sure, though, that that was really available because ordinarily you have to have something to appeal. She had no document, no ruling, no dismissal, nothing, right? I mean, my guess is that that petition would be rejected out of hand. Well, and that's the point. You used the word guess, and I think that's important, Your Honor, because the case law isn't what would they eventually have done. The issue is was there a process she could have pursued and availed herself of? Right, but what I'm saying is it seems at least to me that perhaps if your client's point is that she could have and should have availed herself of this process, you need to show that it existed for her. So a citation to Valencia I don't think shows that in this type of a case that process was available. Well, in Florida, pursuit of certiorari is a matter of right, as Valencia has pointed out in the district court below. McKinney has stated that certiorari is an available review. It's very broad and clear. No, it said that it was available in that case. It did not say any time you have some sort of procedural due process or some sort of due process argument, you have to file cert in Florida courts. Sure. Again, we have to look at what Ms. Barrett is alleging in this case, and if she is alleging that she was denied these processes, she would have an opportunity and a right to pursue a writ of cert in state circuit court to determine whether fundamental fairness had occurred in her case. Judge Grant, I understand that you're concerned. This is a kind of wonky factual case in that she wasn't dismissed. She wasn't disciplined. But she's saying she was deprived of something. But I think the court could point to in the record, there are references where Dr. Echol had responded to Ms. Barrett, I believe there are email correspondences, where she said, you know, here's your paths forward, and you can't proceed any further unless and until you find a major professor. I think that is a turning point where she could have sought certiorari review to say that I'm not being dealt with with a fundamental fairness. You need to look at this process, state circuit court, and she never did. And an interesting thing in this case, too, is getting back to asking the court to consider the issue, when did the deprivation occur? And a reasonable look at the record here is, excuse me, Ms. Barrett would have to allege or contend that the deprivation occurred in May of 2023 is when she received her master's degree and decided that she's not going to pursue a major professor at that point. So the interesting thing about that, and there's a lot of give and take in Ms. Barrett's brief about post-deprivation remedy, pre-deprivation remedy, there was a time, and the fact pattern in this case is such, that she was given five months' notice of the academic requirement that she had to achieve and maintain in order to keep on in the program. She had five months' notice. It was a careful and deliberate decision, ultimately, to say, if you don't have a major professor, you can't continue to take dissertation courses beyond the spring semester, which she was. So she had time within that five-month period. If she thought she was denied a process to avail herself of state court remedial processes to see if she, in fact, had been denied due process or not. And what's interesting, what the courts have dealt with in the past, and I believe, Judge Rosenbaum, it might have been your opinion in Rabin, where the court looked at the factors and the court said or the panel said, look, the appellant here did not avail themselves of state court remedial measures. And therefore, this panel cannot say that the state court would deny any remedial measures available to her because she didn't partake of those or the party didn't partake of those in the first place. And that's the situation that we have here. The crux of this case is that it is undisputed that Ms. Barrett did not avail herself of any state remedial measures. She could have done that before the time that she claims she was deprived of her constitutionally protected interest to which we disagree because it's an academic versus a disciplinary measure. So that point that you just made, is that the appropriate time for us to consider the availability, the feasibility, and the adequacy of the procedures that you maintain were available to her? I think it's both ways, Your Honor. I think you can look at it and say she had a five-month period and she was complaining during that period of time that she was not being available of some remedies she thought were available. She could have used the state court remedial tools available to her, which would have been, I guess, considered pre-deprivation. Post-deprivation, there was only a month between the time that she attained her master's degree and the time that she filed an action in federal court. So arguably under Valencia, arguably under Watts, relying upon McKinney, she would have had those processes available to her. Again, it's a weird factual case because nobody dismissed her from the program, and that's a difference here. But I would point out, too, there's some attention from Ms. Barrett that Valencia was decided wrongfully. And I ask this court to respectfully adhere to the prior panel precedent rule in this situation. But you're describing the prior precedent in a way, I think at least from what I hear from Judge Grant, is an extension from what Valencia stands for. So what are you defining as the prior precedent from Valencia? Well, the prior precedent from Valencia was if there was an available state court remedy. The student there had to pursue it. Watts was ruled on similarly. And prior panel precedent rule says even if... I know what the rule says. I'm trying to understand what you're identifying as the precedent. The precedent under Valencia would be that a student, when they are subject to a dismissal, and that was a disciplinary dismissal, so, therefore, it was easier because the Supreme Court has already recognized a property interest in continued enrollment in a disciplinary sense. So under Valencia, that would be she had... the student had a right to pursue sociority review because it was a matter of right as recognized in Valencia. And Watts is very similar, too. And Watts is very similar to this case in that the student in Watts was removed from a practicum program that was needed to attain a master's degree. And in that situation, again, the court said you could have pursued available state court remedies, did not do so, and, therefore, a due process claim does not exist because you didn't exhaust... Exhaust is a bad word. You didn't avail yourself of the remedies that are required. And with Judge Rosenbaum's... I wouldn't say admonition is kind of strong, but I'm not going to use all the time that's available to me for the grounds that we've talked about today and the reasons set forth in the brief. We ask this panel to affirm the summary judgment granted by the district court. All right, thank you, Mr. Carey. Mr. Bakke, you've reserved five minutes. Thank you, Your Honors. Addressing the property interest issue that counsel discussed here, it's important to understand that their position is that this was solely an academic decision, in which case the courts have ruled that a student has a lesser property interest than a student that is... Lesser or no? Less. I mean, there's still, under Horowitz, the standard is that there has to be a careful and deliberate response, which is a lesser standard than if a student is being... or if action is being taken based on disciplinary action. Well, in this situation, it was only after the allegations of misconduct that Dr. Williams said, I'm no longer going to work with you. And, in fact, at the same time, Dr. Williams filed a student conduct complaint against Ms. Barrett. So it cannot be argued that this was an academic decision. This was a disciplinary decision, and the courts, as we have briefed, have said that there's a much more significant property interest in those cases than there is in a purely academic, a dispensable case. And because the district court didn't analyze the interest part of this issue, should we remand... Assuming we agree with you, should we remand for the district court to do that in the first instance? That would be one of the appropriate actions, yes. The one you recommend? I know you would love to win here, but... I'd love for the court to make that decision, but I understand, and yes, I do think it would be appropriate to remand that issue back to the district court. Do you want to say anything in response to your friend's argument that Ms. Barrett alleged only that the people that she talked to said no as opposed to that she spoke to everyone and they all said no? I know that, and that was something that wasn't flushed out in the briefing, and I'm not even sure how flushed out it was in depositions. I know that she did reach out to all of the professors that were advertising that they were looking for students to work, you know, who would work in their lab. I know that. Whether or not she reached out to other professors, I don't know. I think that's a question of fact that should be flushed out at trial. Because it matters? I mean, if it was her understanding, and I'm just stating a hypothetical here, if it was her understanding that the only instructors that she could apply to or go to and ask if they are taking on any students are those instructors who were advertising that, then I think that's important as opposed to, you know, if there was no point in going and asking a professor who isn't currently advertising for a student, then I don't think it matters. But I don't know the answer to that. Let me put this to you to try to make sure I'm understanding it properly. Her argument is that there is a set of formal procedures that should have been followed that were not, right? There's a set of procedures that we laid out in our opening brief. But in addition to that, they're claiming that those procedures don't apply. Okay, well, then let's find a procedure or some sort of process that would apply here. No, but that's why I'm asking you that, though, because I think that it's been very diffuse on both sides about what was required or what wasn't required or what was sought or what wasn't sought. And so is she saying there was a set of formal procedures that should have been followed that were not? Yes, so in the catalogs, there are a set of formal procedures. Once she was told that those procedures didn't apply, she said, okay, well, let's have a hearing or something in front of someone else. And the most logical bodies to hear that would have been her committee, which is set up to not only advise her but to protect her. But is she accepting that there was not a set of formal procedures available when a major professor declines to work with a student anymore? No, we're not accepting that. That's what I'm trying to ask. What procedures do you think were already written down that were supposed to be followed that were not? That she should have had a right to an appeal, that she... What page of what handbook is that on? I would have to look at the opening brief to tell you that. Well, that's why I'm a little... because I was looking at the opening brief, and it kind of references toward several sets of procedures that may have been available, but then it does say there is no provision for a major professor or committee abandoning their obligations prior to degree completion. Right, so those policies would pertain to, you know, if they were to say... if they finally were going to say that you are dismissed from this program. So when it comes to what you're asking, and I now understand what you're asking about the major professor, no, we're not aware of any procedure that specifically addressed the major professor issue. Okay, thank you. Thank you. Thank you very much, Mr. Bach.